## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| FACULTY RIGHTS COALITION, | § | |
| and WOLFGANG P.H. de MINO, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-04-2127 |
| | § | |
| HOSSEIN SHAHROKHI, in his official | § | |
| capacity as Executive Director of | § | |
| Information Services, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

Wolfgang P.H. de Mino is a part-time adjunct faculty member at the University of Houston Downtown campus. De Mino advocates on behalf of the interests of part-time adjunct faculty at UHD. In furtherance of those efforts, he has formed a group that he calls the Faculty Rights Coalition and has filed various lawsuits against UHD officials. In this suit, he alleges that Hossein Shahrokhi, Molly Woods,[1] and Adolfo Santos[2] violated his federal constitutional rights and sought damages and an injunction. This court denied de Mino's application for a preliminary injunction in August 2004. Defendants have moved for

---

[1] De Mino argues that he has sued Woods in both her official and individual capacities. For the purpose of analyzing the pending motions, this court assumes that Woods, who asserts qualified immunity, has been sued in both capacities.

[2] De Mino filed an opposed motion to join Santos as an additional defendant, which was denied. De Mino then moved for reconsideration. As explained below, the proposed claims against Santos would be futile; the motion for reconsideration is denied.

O:\Relief Case Managers\Diane\04-2127.memo.wpd

summary judgment dismissing de Mino's claims.  De Mino has cross-moved for summary judgment and sought a second preliminary injunction.

Based on a careful review of the pleadings, the motions and responses, the parties' submissions, and the applicable law, this court grants defendants' motion for summary judgment; denies plaintiffs' cross-motion for summary judgment; denies plaintiffs' application for a preliminary injunction; and, by separate order, enters final judgment dismissing this suit.  The reasons are set out below.

## I.        Background

De Mino has a Ph.D. in political science from the University of Houston and has been teaching political science as a part-time adjunct faculty member since the fall semester of 2000.  UHD divides faculty into two groups: full-time (tenure, tenure-track, or lecturers) and part-time (adjunct).   In this lawsuit, de Mino initially focused on UHD's policies and practices with respect to adjunct faculty members' access to the campus e-mail system.  De Mino alleged that when he tried to use the e-mail distribution system to complain about UHD's compensation and treatment of adjunct faculty members, he was denied access to his e-mail account.   This court held an evidentiary hearing on de Mino's application for a preliminary injunction in August 2004 and denied the relief he requested.

In his first amended complaint, de Mino sued Hossein Shahrokhi, the Executive Director of Information Technology at UHD, and Molly Woods, the chief academic officer of UHD.  De Mino also sought leave to add as a defendant Adolfo Santos, the Administrative Assistant Chair for the Department of Social Sciences at UHD since July 2004 and

previously the political science coordinator for UHD.  De Mino reasserted his complaints that adjunct faculty are paid less for their work and time than full-time faculty.  De Mino alleged that most adjuncts are only allowed two courses each semester, because a larger teaching load would require UHD to pay benefits.  De Mino reasserted his complaints about limits on his e-mail account access, including the complaint that unlike full-time faculty, adjunct faculty do not have access to their UHD e-mail accounts over the summer unless they are teaching summer school, or during any semester they are not teaching.  De Mino reasserted his claim that UHD had prevented him from accessing his own e-mail account in retaliation for his attempt to use the e-mail distribution system to circulate complaints about UHD's treatment of adjunct faculty.  De Mino added an allegation that in retaliation for his lawsuit, UHD had converted his adjunct position to a non-benefits-eligible position, terminated his active status in the Teacher Retirement System, reduced his net pay for the fall semester by reducing his teaching allotment to two courses, and had continued to deny him access to his e-mail account.  De Mino asserted causes of action for violations of the First Amendment and retaliation for exercising his First Amendment rights.  He also alleged a denial of equal protection on the basis that adjunct faculty are paid less, given fewer benefits, denied the same opportunity to affect governance, and given fewer supporting resources, than full-time faculty.  De Mino also challenged the constitutionality of Texas statutory prohibitions on unionization of state employees and on the ability of noncitizens to become labor union officials or organizers.

Defendants moved for summary judgment on each of de Miro's claims.  De Mino

cross-moved for partial summary judgment on his claim challenging the constitutionality of the Texas law prohibiting aliens from labor organization, section 101.109 of the Texas Labor Code.

Each of the grounds for summary judgment is analyzed below.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under FED. R. CIV. P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*,  477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil and Chemical Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings.  *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000).  The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.  *See id.*

The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986).

In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255.  "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

## III.   The First Amendment Claim

De Mino claims that UHD violated his First Amendment rights by only allowing him access to his university e-mail account in the semesters he was working as an adjunct professor, and by otherwise imposing restrictions on using the UHD e-mail system.  UHD has submitted summary judgment evidence of the nature and extent of the limits on the UHD e-mail system.  In an affidavit, Shahrokhi describes the general policy of providing access to UHD e-mail accounts for faculty with full-time status and, for adjunct faculty, those who

have entered into contracts to teach in that semester or session.  Shahrokhi's affidavit states

in relevant part as follows:

> With Microsoft Outlook and Exchange, UHD provides faculty and staff a UHD-sponsored e-mail address and computer network account for transacting and storing messages.  The IT Division manages UHD's e-mail infrastructure in ways that can cause UHD e-mail users, including adjunct professors, to lose access to e-mail capabilities under the Outlook and Exchange software.  The practices do not result from formal policies – they are management practices intended to cap the use of limited computer memory resources at UHD.

> For example, in regard to faculty, the IT Division ordinarily only assigns and activates an e-mail address and account for each UHD professor with full-time (tenure, tenure track, or lecturer) status or who's teaching in an adjunct capacity.  By pre-defining the expiration date of an adjunct professor's account when he or she is retained to each, Exchange 'knows' to cancel their access after the end of the semester during which they're contracted to teach.  So when an adjunct professor is not contracted by UHD to teach during a semester or summer session, the professor loses access to his or her e-mail account. IT restores or continues access once an adjunct professor's academic department confirms that the professor is returning to teach on an adjunct or full-time basis.  IT did not extend Mr. Hirczy de Mino's account for the summer of 2004 in accordance with this general IT practice.[3]

UHD also provided summary judgment evidence as to the general rules it uses to

operate the e-mail system for the campus:.

> In consultation with other IT professionals, I or Exchange administrators also designate 'rules' in the Exchange program intended to govern all categories of e-mail addresses and accounts provided by UHD.  Rules include limiting all e-mail

---

[3]  Docket Entry No. 40, Ex. B, ¶ 2–3.

users, including professors, to 20 megabytes – or 20,000 K – of memory to their e-mail accounts, which they can use for storing e-mails and attachments. Users approaching this storage capacity on their accounts automatically receive warnings that they're about to surpass their storage capacity. Once past 20 megabits, the Exchange system operates to restrict them from sending e-mails from their UHD e-mail accounts. When they surpass 100 megabits – or 100,000 K – of data, Exchange restricts them from receiving e-mails, too.

. . . .

The IT Division administers a 'SPAM' filter that applies to all UHD e-mail accounts. We implemented the filter in January 2004. It is intended stop users from receiving junk solicitations or e-mail communications that could clog up the university's e-mail system and individual mail boxes. The filter uses a set of standard rules that are automatically and uniformly applied to all incoming e-mail to evaluate the probability that it is SPAM. E-mail messages that meet the rules are quarantined, then a report of the quarantined e-mail, naming the sender's address and subjects, gets sent to the targeted user. The report states the percentage probability that the message is SPAM. The user has the opportunity to release the quarantined e-mail message by clicking on the message ID and the Send button. That action delivers the message to the user within a few minutes.[4]

In response to de Mino's allegation and testimony that his ability to send e-mails to other faculty at UHD was blocked, Shahrokhi presented competent summary judgment evidence that some of the problems de Mino encountered resulted from his exceeding the designated storage capacity imposed on all e-mail accounts on two occasions, in June 2004 and in February 2005.[5] Shahrokhi also describes a second source of the problems de Mino

---

[4] *Id.*, ¶ 5, 7.

[5] Shahrokhi's affidavit states:

encountered in trying to use the e-mail account:  using a private e-mail address without

taking the steps necessary to designate it as legitimate to prevent it from being quarantined

under the system-wide "spam" filtering software.[6]  Shahrokhi's affidavit and attachments

make it clear that de Mino was otherwise able to send and receive e-mails to distribution lists

---

> **Attachment 3** is a true and accurate copy of Mr. Hirczy de Mino's
> use of his e-mail storage capacity in June 2004 and again in February
> 2005.  It shows that Mr. Hirczy de Mino surpassed the generally-
> applied, 20,000 K account limitation.  Consequently, he was and is
> not able to send e-mails using his UHD address.  **Attachment 3** also
> shows the account status of some other people with UHD e-mail
> accounts and addresses.  IT limits and manages their accounts in a
> uniform fashion.  Staff and faculty, including Mr. Hirczy de Mino,
> who surpass their e-mail storage usage can 'free up' capacity and
> restore their e-mail capabilities by deleting data or file-managing data
> in their accounts.   With his department's approval and after
> exhausting other options, a user may also request an increase in his
> or her e-mail capacity by contacting IT's support group.

*Id.*, ¶ 6.

[6]  Shahrokhi's affidavit states:

> **Attachment 4** is a true and accurate copy of records I understand Mr.
> Hirczy de Mino designated as exhibits in connection with his lawsuit
> against me.  It shows that UHD's SPAM filtering software quarantined e-
> mails directed to Mr. Hirczy de Mino's UHD e-mail address in 2004, and
> represented to the reader that the e-mail had a 35 percent probability of
> being SPAM.  The quarantined e-mail originated from the following e-mail
> address: Wofh778@cs.com.  Since the filtering system looks for generic
> and industry-wide accepted signatures common to SPAM e-mails, it is
> always possible for legitimate e-mails to be quarantined.  But any recipient
> of the e-mails could have released and read the e-mails following the
> procedure I described.  Individual users also have the capacity to designate
> e-mail addresses as 'good' addresses they want to receive from, without
> quarantine.  Also, when I learned at the end of December 2004 that UHD's
> software was filtering some messages from Wofh778@cs.com, I asked IT's
> SPAM administrator to designate the address in the filter so that messages
> originating there won't get quarantined.  I believed and believe that Mr.
> Hirczy de Mino uses it as his private, non-UHD address.

*Id.*, ¶ 8.

that include all users of the e-mail system, and that no restrictions were based on the content of any of de Mino's e-mail communications.[7]

In *Perry Education Assen v. Perry Local Educators Assen*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court held that a public school system's internal mail system did not constitute a state-created public forum and that the school board could reserve the forum for its intended purposes, communicative or otherwise, as long as it did not discriminate on the basis of viewpoint and the limitations it imposed were reasonable in light of the purpose served by the forum.  A state university's e-mail system, even for a large state university, may be a nonpublic forum.  *See Loving v. Boren*, 956 F. Supp. 953 (W.D. Okla.1997) (holding that the University of Oklahoma computer and Internet services do not constitute a public forum because they are lawfully dedicated to academic and research uses), *aff'd on alternate grounds,* 133 F.3d 771 (10th Cir.1998); *cf. White Buffalo Ventures v. The University of Texas at Austin*, 2004 WL 1854168 *6-7 (W.D. Tex.)).  Identity-based and subject matter distinctions in a nonpublic forum are permissible so long as they are not a covert attempt to suppress a particular viewpoint and are reasonable in light of the purpose of the forum.  *Chiu* v. *Plano Indep. School Dist.*, 260 F.3d 330, 356 (5th Cir. 2001).

Regulations on the speech of those who teach within a school are drawn more narrowly than regulations on the speech of outside representatives.  *See Ysleta Fed'n of Teachers v. Yselta Indep. School Dist.*, 720 F.2d 1429, 1435 (5th Cir. 1983); *Hall v. Board*

---

[7]  *Id.*, ¶ 10.

*of School Comm'rs of Mobile County, Ala.*, 681 F.2d 965, 968 (5th Cir. 1978) (distinction exists between teacher communications and the rights of "persons not assigned to the schools").  *Perry,* which concerns the rights of organizations outside the schools, does not directly apply to teacher communication within the school.  *Texas State Teachers Assn. v. Garland Indep. School Dist.*, 777 F.2d 1046, 1053 (5th Cir. 1985), *aff'd Texas State Teachers Assn. v. Garland Indep. School Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989); *see also Hastings v. Bonner*, 578 F.2d 136, 143 (5th Cir.1978) ("[T]here is no doubt that this circuit has adopted and now applies the *Tinker* test in cases involving the First Amendment rights of teachers.").  The *Tinker* test comes from *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), which held that teacher communications may be suppressed only when "the expression or its method of exercise materially and substantially interferes with the activities or discipline of the school."  *Hastings*, 578 F.2d at 143 *Texas State Teachers Assn.*, 777 F.2d at 1053;  *see also Porter v. Ascension Parish School Bd.*, 393 F.3d 608, 615 (5th Cir. 2004); *Chiu v. Plano Indep. School Dist.*, 339 F.3d at 281; *Canady v. Bossier Parish School Bd.*, 240 F.3d 437, 442 (5th Cir. 2001); *Gay Student Servs. v. Texas A & M Univ.*, 737 F.2d 1317, 1324 (5th. Cir. 1984).

To the extent de Mino challenges restrictions on his ability to access his UHD e-mail account during the semesters and sessions when he was not under contract to teach and therefore not a member of the UHD faculty, *Perry* appears to apply.  To the extent de Mino challenges restrictions on his use of the e-mail system during the semesters he was under contract to teach, when he did have access to his UHD e-mail account, *Tinker* appears to

apply.  *See Texas State Teachers Assn.*, 777 F.2d at 1053.

Under either approach, the undisputed competent summary judgment evidence shows that, as a matter of law, there is no First Amendment violation.  The undisputed competent summary judgment evidence shows that UHD did not create a public forum.  Even if the e-mail system is treated as having public forum characteristics, there is no infringement of First Amendment rights.  The system-wide anti-spam filtering and limits on the amount of storage capacity imposed on e-mail account use by faculty and staff who are authorized users are not content- or viewpoint-based restrictions and are reasonable in light of the need to control the amount of data stored on the system and to filter the data coming into the system.  *See White Buffalo Ventures*, 2004 WL 1854168 * 7.  Restricting access to full-time faculty and adjuncts under contract to teach that semester is a status restriction, which serves the goal of controlling the amount of data stored on the system and limiting its use to those consistent with the university's activities and purposes.  There is no evidence that UHD's restriction on adjuncts' e-mail access to the semesters in which they are teaching is a "covert attempt to suppress a particular viewpoint."  *See Chiu I*, 260 F.3d at 356.  Controlling the amount of data allows more disk space for full-time faculty and adjuncts under contract to teach, which facilitates communication with students and with each other.  UHD was reasonable in determining that eliminating access for adjuncts not under a contract to teach would help control the amount of data stored on the system.  UHD was also reasonable in determining that  this control on access would be consistent with limiting the use of the system to current members of the UHD community.

De Mino does not offer any evidence that his problems with the e-mail system during the semesters in which he was under contract to teach are due to anything but the uniform application of the spam filters and the storage limitations placed on all accounts.  The spam filters is designed to "stop users from receiving junk solicitations or e-mail communications that could clog up the university's e-mail system and individual mail boxes."[8]  After learning of de Mino's problems with the spam filtering program, UHD added his personal e-mail address to a list so that it would not be quarantined.[9]  UHD does not prohibit de Mino from contacting other faculty members through e-mail; rather, the competent summary judgment evidence shows that de Mino's account was subject to the system-wide rules for sending and receiving e-mails and maintaining accounts.  UHD's methods are reasonably required by the need to manage a large e-mail system, and doing away with them would "substantially interfere with the activities . . . of the school."  *Tinker*, 393 U.S. at 513.  In order for the e-mail system to operate smoothly and for teachers and students to be able to send and receive their mail, some measures must be taken to conserve disk space and prevent spammers from clogging up the system and individual mail boxes.

UHD presented competent summary judgment evidence that both the spam filters and limits on the storage capacity of individual accounts, and the policy of restricting  access to the e-mail accounts to full-time faculty and to adjuncts who are under a contract to teach in

---

[8]  Docket Entry No. 40, Ex. B, ¶ 7.

[9]  *Id.* at ¶ 8.

a given semester or session, were necessary to the operation of the UHD e-mail system.

This court grants defendants' motion for summary judgment dismissing de Mino's claim that the restrictions on his access to, and use of, his e-mail account violated the First Amendment.

## IV.    The First Amendment Retaliation Claim

De Mino alleges that UHD retaliated against him for his advocacy on behalf of adjunct faculty and for filing this lawsuit by reducing his course load and corresponding compensation.  In an affidavit, Adolfo Santos describes the policy and practice with respect to contracting with part-time or adjunct faculty members to teach political science. According to Santos, full-time faculty (who are almost all tenured or tenure-track) are scheduled first, and their preferences are given priority.  Part-time adjunct faculty are hired to teach on a class-by-class and semester-to-semester basis, to supplement the classes taught by full-time faculty.  UHD does not provide benefits to part-time adjunct faculty members unless they are teaching three or more class sections.  In order to reduce expenditures in the political science department, beginning in 2003 Santos began "gradually restricting to two the number of sections assigned each adjunct professor per semester."[10]  In the fall semester of 2004, three adjuncts, including de Mino, asked to teach three course sections.  Santos allowed only one to do so, because that individual had more seniority than the other two and would be willing to teach a section on Saturday.[11]

---

[10]  Docket Entry No. 44, Ex. C, ¶ 6.

[11]  *Id.*

To prove a First Amendment retaliation claim under section 1983, a plaintiff must show that:  (1) he suffered an adverse employment action; (2) his speech involved a matter of public concern; (3) his interest in commenting on matters of public concern outweighed the government employer's interest in promoting efficiency; and (4) his speech motivated the adverse employment action.  *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004); *Harris v. Victoria Ind. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir.1999).  To determine whether speech is related to a matter of public concern, a court must examine whether the plaintiff  spoke primarily in his role as a citizen or primarily in his role as an employee addressing matters of private concern.  *See Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359 (5th Cir. 2000) (*citing Terrell v. Univ. of Tex. Sys. Police*, 792 F.2d 1360, 1362 (5th Cir. 1986)).[12]  The last element is one of causation:  if the decisionmaker who imposed the adverse employment action was not motivated by the speech, then the speech did not cause the adverse employment action.  *See Johnson v. Louisiana*, 369 F.3d 826, 830 (5th Cir. 2004); *Beattie v. Madison County School Dist.*, 254 F.3d 595, 631 (5th Cir. 2001).

---

[12]  *See Teague v. City of Flower Mound*, 179 F.3d 377, 381 (5th Cir. 1999) ("[S]peech concerning the conditions of one's employment is a private matter."); *Moore v. City of Kilgore*, 877 F.2d 364, 371-72 (5th Cir. 1989) (stating that employee's speech concerning local fire department's staffing shortage, while a matter of public concern because it involved the department's ability to effectively fight fires, also included an element of personal concern as the employee was criticizing his employer's policy).

The record reveals that de Mino advised the UHD administration that he wished to speak on a number of areas, ranging from the salaries paid University of Houston administrators to the pay and role of adjuncts. In his complaint, de Mino alleged that his protected speech included not only his e-mail and other communications on these topics, but also his litigation-related activities. Assuming that de Mino's speech was on matters of public concern, he has not raised a disputed fact issue material to deciding whether the change in his teaching load in the fall semester of 2004 resulted from his speech. Rather, the undisputed summary judgment evidence is that in the fall semester, after the protected speech, UHD again contracted with De Mino to teach as an adjunct in the political science department. Although he had taught three sections the previous semester, UHD has presented competent summary judgment evidence that when possible, adjuncts are limited to teaching two sections in order to avoid having to pay them benefits. Indeed, de Mino himself alleges a campus-wide effort to contract with adjuncts in this manner. (Docket Entry No. 50, p. 4). The evidence shows that in the fall semester of 2004, Santos assigned nine out of the ten part-time adjunct professors no more than two sections. The tenth received a third assignment because of his greater seniority and willingness to teach on Saturdays. In the spring semester of 2005, none of the ten adjunct faculty members in the political science department teach more than two class sections.[13] There is no competent summary judgment evidence that UHD singled out de Mino to reduce his teaching load to two sections to

_____

[13] Docket Entry No. 41, Santos Affid..

retaliate for his speech, while providing a higher teaching load to other adjunct faculty. The only summary judgment evidence that the change in de Mino's teaching load is linked to his litigation and advocacy is timing and his subjective opinion; the law is clear that neither is sufficient to raise a disputed fact issue to defeat summary judgment. *See Roberson v. Alltell Info. Servs.*, 373 F.3d 647, 656 (5th Cir. 2004) (holding timing insufficient to show causation when the employer reduced the employee's workload); *Harvey v. Stringer*, 113 Fed.Appx. 629, 630 (5th Cir. 2004) (timing alone did not create genuine issue of material fact in a retaliation claim when the defendant provided legitimate reasons for the adverse employment action)*; Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003) ("Their mere involvement in the disciplinary proceedings against him, without more, does not establish either retaliatory motive or causation."); *Beattie.*, 254 F.3d at 601 (declining to infer causation from timing alone); *cf. Crawford-El v. Britton*, 523 U.S. 574, 593, 118 S.Ct. 1584, 1594 (1998) ("Accordingly, when a public employee shows that protected speech was a 'motivating factor' in an adverse employment decision, the employer still prevails by showing that it would have reached the same decision in the absence of the protected conduct.").

This court grants defendants' motion for summary judgment as to de Mino's First Amendment retaliation claim.[14]

## V.    The Equal Protection Claims

---

[14]    In light of this analysis, de Mino's motion to reconsider the decision to deny the addition of Santos as a defendant is denied, and the application for a preliminary injunction requiring UHD to restore de Mino to a teaching load of more than two sections is denied.

De Mino maintains that UHD violated the Equal Protection Clause of the Fourteenth Amendment by treating adjunct faculty less favorably than full-time, tenured or tenure-track faculty.  To preclude the grant of summary judgment on this claim, de Mino must present competent summary judgment evidence that UHD treated him differently from others who were similar situated, without a sufficient basis for the differential treatment.  *Wheeler v. Miller*, 168 F.3d 241, 252 (5th Cir.1999); *see also Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (clarifying that equal protection claims can be brought by a "class of one" without allegation of race or other class-based animus "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.").

While "the Equal Protection Clause essentially directs that all persons similarly situated be treated alike," *Wheeler v. Miller*, 168 F.3d at 251, "'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation'," *Allred's Produce v. United States Dept. of Agriculture*, 178 F.3d 743, 748 (5th Cir. 1999) (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)).  While equal protection claims ordinarily have been premised on allegations of class-based discrimination, the Supreme Court has clarified that the protection afforded by the Equal Protection Clause is not so limited.  In *Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000), the Court recognized that successful equal protection claims may, and have, been "brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in

17

treatment." *Id.* at 1074.  The Court reiterated that "'[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'"  *Id.* at 1074-75 (*quoting Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445, 43 S.Ct. 190, 67 L.Ed. 340 (1923)) (*quoting Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 352, 38 S.Ct. 495, 62 L.Ed. 1154 (1918)).

De Mino alleges that UHD treated all adjunct faculty differently from full-time faculty, including by paying adjunct faculty less and by depriving them of equal access to participation in UHD governance, such as membership and voting rights in the Faculty Senate.  UHD has presented competent summary judgment evidence that adjunct part-time faculty are not similarly situated to full-time faculty, and that there is a rational basis for the differential treatment.  De Mino has failed to raise a disputed fact issue material to determining that similarly-situated persons were treated differently or that UHD lacked a rational basis for its actions.  This court grants UHD's motion for summary judgment as to the equal protection claim.

## V.   The Constitutional Challenge to the Texas Statutory Restrictions on Unionizing Public Employees

De Mino asserts that he informed UHD officials of his intent to "form a labor union representing adjunct faculty." (Docket Entry No. 61, p. 2).  He also asserts that he registered a name with the Harris County Clerk's Office for an advocacy organization for adjunct

faculty.  In his declaration, De Mino asserts that the "Faculty Rights Coalition" is an advocacy "vehicle."  De Mino asserts that in response to his efforts to "collectively pursue the betterment of the adjuncts' working conditions," UHD officials referred him to the "Texas Labor Code and a UH system policy purporting to prohibit unionization at UH." (Docket Entry No. 50, p. 5).

Under Texas Government Code § 617.002, "a political subdivision . . . may not enter into a collective bargaining agreement with a labor organization regarding wages, hours, or conditions of employment of public employees" and "a political subdivision . . . may not recognize a labor organization as the bargaining agent for a group of public employees." *Id.* (b).  "Public employees may not strike or engage in an organized work stoppage." *Id.* § 617.003(a).  Further, "[a]n individual may not be denied public employment because of the individual's membership or non membership in a labor organization." *Id.* § 617.004.  Texas law also makes it clear that these provisions do "not impair the right of public employees to present grievances . . . either individually or through a representative." *Id.* § 617.005. "Representative" as used in the statute includes, but is not limited to, unions or union members. *Sayre v. Mullins*, 681 S.W.2d 25 (Tex. 1984).  The UH System Administrative Memorandum 02.A.32 is based on these sections.  De Mino alleges that the Texas Government Code provisions, and the UHD policy based on those provisions, are unconstitutional.

As the Fifth Circuit explained in *Moreau v. Klevenhagen*, 956 F.2d 516, 520 (5th Cir.1992), *aff'd*, 508 U.S. 22, 113 S.Ct. 1905, 1909 n.10, 123 L.Ed.2d 584 (1993):

> Presentation of grievances is acceptable under Texas law because it is a unilateral procedure under which the employee can be represented by anyone he or she chooses, be it a lawyer, clergyman, union or some other person or organization. Texas law prohibits any bilateral agreement between a city and a bargaining agent, whether the agreement is labeled a collective bargaining agreement or something else.  Under Texas law, the County could not enter into any agreement with the Union.

*See also Communication Workers of America v. Ector County Hosp. Dist.*, 392 F.3d 733, 753 (5th Cir. 2004); *see Sayre v. Mullins*, 681 S.W.2d 25, 28 (Tex. 1984).  The restriction is on bilateral negotiations and agreements between a division or agency of the State and a bargaining agent; there is no restriction on the ability of public employees to present grievances, either individually or through representatives.  The Texas law does not appear to preclude De Mino or the Faculty Rights Coalition from  presenting grievances on behalf of adjunct professors or organizing to advocate for change in the pay and working conditions of adjunct professors.  Because de Mino is not precluded from pursuing his advocacy or organizational efforts by the Texas statute, he lacks standing to assert its unconstitutionality. *See Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 301 (5th Cir. 2005) ("Standing, one of the doctrines arising under the case and controversy requirement, requires a plaintiff 'to demonstrate:  they have suffered an "injury in fact"; the injury is "fairly traceable" to the defendant's actions; and the injury will "likely . . . be redressed by a favorable decision."'"); *Delta Commercial Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council*, 364 F.3d 269, 272 (5th Cir. 2004) (upholding dismissal because of lack of actual injury).

De Mino separately alleges and seeks partial summary judgment that section 101.109

of the Texas Labor Code, which states that a person "may not serve as a labor union officer or as a labor organizer if the person . . . is an alien," is unconstitutional.  A review of the case law reveals no case resting on this provision since 1945.[15]  De Mino does not allege that UHD has invoked this provision to prevent any activity he wishes to pursue.  On its face, this provision does not apply to what de Mino describes as the activity he wishes to pursue.  The statute prevents an alien from serving as a labor union officer or as a labor organizer.  De Mino has not alleged or presented evidence that he seeks to be a labor union officer.  Nor has de Mino alleged or presented evidence that he seeks to serve as a "labor organizer," which is defined to mean "a person who for a financial consideration solicits membership in a labor union or members for a labor union."  Tex. Lab. Code. Ann. § 101.101(2) (1996).  Because de Mino has not alleged or presented evidence that as an "alien," he would be precluded by the statute from the activities he alleges that he intends to pursue, he lacks standing to seek to invalidate the statute.  *See Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 124 S.Ct. 2301, 2308, 159 L.Ed.2d. 98 (2004) (noting the commitment "'not to pass on questions of constitutionality' unless adjudication of the constitutional issue is necessary."); *Kowalski v. Tesmer*, 125 S.Ct. 564, 567, 160 L.Ed.2d 519 (2004) ("The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance.  This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'"); *Energy Mgmt.*, 397 F.3d at 301; *Delta Commercial Fisheries*,

---

[15]  *American Federal of Labor v. Mann,* 188 S.W.2d 276 (1945).

364 F.3d at 262.

De Mino's motion for partial summary judgment that the Texas statute is unconstitutional is denied.  UHD's motion for summary judgment dismissing de Mino's challenges to the Texas statutory provisions on the basis of lack of standing is granted.

## VI.    Conclusion

UHD's motion for summary judgment is granted.    De Mino's motion for reconsideration, for a preliminary injunction, for status and for transfer, and for partial summary judgment, are denied.  Final judgment will be entered by separate order.

SIGNED on July 13, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge